# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: [X] COMPLAINT    [ ] INFORMATION    [ ] INDICTMENT    [ ] SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

## OFFENSE CHARGED

21 U.S.C. §§ 841(a)(1) and (b)(1)(C) - Possession with intent to distribute methamphetamine

[ ] Petty
[ ] Minor
[ ] Misdemeanor
[ ] Felony

**FILED**
Mar 11 2024
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**PENALTY:** Imprisonment 20 years max; Fine $1,000,000; Supervised release: min 3 years, max life; $100 assessment; forfeiture; deportation; deny federal benefits

### DEFENDANT - U.S

Denilson Velasquez-Sevilla a/k/a Guille a/ka/ Yeye

DISTRICT COURT NUMBER

4:24-mj-70378-MAG

## PROCEEDING

Name of Complaintant Agency, or Person (& Title, if any)
DEA Special Agent Hakeem Oduniyi

[ ] person is awaiting trial in another Federal or State Court, give name of court

[ ] this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

[ ] this is a reprosecution of charges previously dismissed which were dismissed on motion of:
   [ ] U.S. ATTORNEY    [ ] DEFENSE

SHOW DOCKET NO.

[ ] this prosecution relates to a pending case involving this same defendant

[ ] prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form: Ismail J. Ramsey
[X] U.S. Attorney    [ ] Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): Emily R. Dahlke

### DEFENDANT

**IS NOT IN CUSTODY**
1) [X] Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶ _____
2) [ ] Is a Fugitive
3) [ ] Is on Bail or Release from (show District) _____

**IS IN CUSTODY**
4) [ ] On this charge
5) [ ] On another conviction    [ ] Federal [ ] State
6) [ ] Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution _____

Has detainer been filed? [ ] Yes [ ] No   If "Yes" give date filed _____

**DATE OF ARREST** ▶ Month/Day/Year _____

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶ Month/Day/Year _____

[ ] This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

**PROCESS:**
[ ] SUMMONS    [ ] NO PROCESS*    [X] WARRANT    Bail Amount: _____

If Summons, complete following:
[ ] Arraignment    [ ] Initial Appearance

Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____    Before Judge: _____

Comments:

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America ) | |
| v. ) | |
| ) | Case No. 4:24-mj-70378-MAG |
| Denilson Velasquez-Sevilla a/k/a Guille a/ka/ Yeye ) | |
| ) | |
| *Defendant(s)* | |

FILED

Mar 11 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  December 12, 2023  in the county of  Alameda  in the
Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) | Possession with intent to distribute fentanyl |

This criminal complaint is based on these facts:

Please see the attached affidavit of DEA Special Agent Hakeem Oduniyi

☑ Continued on the attached sheet.

/s/ Hakeem Oduniyi
*Complainant's signature*

DEA Special Agent Hakeem Oduniyi
*Printed name and title*

Approved as to form  /s/ Emily R. Dahlke
AUSA  Emily R. Dahlke

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 03/11/2024

*Judge's signature*

City and state:  Oakland, California   Hon. Donna M. Ryu, Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Hakeem Oduniyi, a Special Agent of the Drug Enforcement Administration (the "Agency"), being duly sworn, hereby declare as follows:

## INTRODUCTION

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a criminal complaint and arrest warrant authorizing the arres of Denilson VELASQUEZ-Sevilla a/k/a GUILLE a/k/a YEYE ("VELASQUEZ") for a violations of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) (Distribution of a Schedule II Controlled Substance, fentanyl), on or about January 12, 2023, in the Northern District of California.

## SOURCES OF INFORMATION

2. The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents, officers, and witnesses. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint and arrest warrant, I have not included every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint and arrest warrant. My understanding of the facts and circumstances of the case may evolve as the investigation continues.

**AGENT BACKGROUND**

4.      I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA). I have been employed with the DEA and assigned to the Oakland Resident Office since March 2020. As a Special Agent of the DEA, I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law, including drug offenses. As a DEA Special Agent, I am authorized to investigate violations of United States law and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

5.      I have attended various trainings regarding narcotics investigations, including a 14-week Basic Agent Training program where trainees are trained on surveillance techniques, evidence processing, drafting drug affidavits, writing search warrants, and interview techniques. Trainees are also trained on drug identification, courtroom testimony, and Federal laws pertaining to the possession, sale, and distribution of illegal narcotics. I hold a B.S. degree in Criminal Justice Administration.

6.      I previously served as a Task Force Officer with Immigration Customs Enforcement, Homeland Security Investigations, Border Enforcement Security Task Force, Gulf Coast HIDTA Group. My parent agency was the Gulfport, Mississippi Police Department for approximately 6 years, where I held the rank of Detective in the Narcotics Division for approximately 3 years. While assigned as a HSI TFO, I investigated a multi-state drug trafficking organization that trafficked drugs to include MDMA, cocaine, cocaine base, and marijuana from Houston, TX, through Gulfport, MS, to Atlanta, GA. I also investigated over 10 illegal aliens for illegal entry into the United States as well as illegal aliens in possession of a firearm. While

assigned as a Narcotics Detective, I conducted approximately over 195 drug investigations that included the illegal possession, sale, and trafficking of methamphetamine, cocaine, cocaine base, MDMA, pharmaceuticals, and marijuana as well as prescription fraud investigations. I also conducted robbery investigations, burglary investigations, and investigations of aggravated assaults.

7. My primary duties as a Special Agent with the Drug Enforcement Administration include the investigation of organized narcotics traffickers. I have participated in numerous narcotics investigations, during the course of which I have conducted or participated in: physical and wire surveillances, including previous Title III investigations, undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefing of informants, and reviews of taped conversations and drug records. I have also been the Affiant for federal search warrants and arrest warrants. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. I have become familiar with conduct common among drug traffickers such as the concealment of monetary and non-monetary drug proceeds, the use of various conveyances to transport and traffic illegal narcotics, and the use of modern technology to aid in the growth and expansion of the drug trafficking organization.

8. I have performed and continue to perform various duties, which include, but are not limited to:

   a. Working in an undercover capacity principally for the purpose of purchasing drug evidence from wholesalers of illegal drugs.

    b.   Working in the capacity of a surveillance agent detecting and recording movement of persons known to be or suspected of being involved in the illegal drug trafficking business.

    c.   Working as a case agent directing the investigation of various illegal drug traffickers and their organizations.

    d.   Directing investigations involving complex conspiracies in which numerous drug traffickers located in various states, and foreign countries were working in concert to illegally import, possess and distribute illegal drugs within the United States.

9. Collectively, I possess a total of nearly 10 years' worth of knowledge, training, and experience in law enforcement, which encompasses enforcing criminal statutes and conducting investigations.

10. I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law, including the Target Offenses.

## STATEMENT OF PROBABLE CAUSE

11. VELASQUEZ is a drug dealer residing in the East Bay who sells lethal narcotics – including fentanyl– in the Tenderloin neighborhood of San Francisco as well as in Oakland.

12. Since August 2023, the DEA and the Alameda County Narcotics Task Force (ACNTF) have been investigating the drug trafficking patterns of VELASQUEZ and his associates. From about August 2023 to about January 2024, an ACNTF detective, acting in an undercover capacity (hereinafter the "UC"), purchased multiple ounce quantities of suspected fentanyl from VELASQUEZ.

13. The investigation began in August 2023, when the UC met VELASQUEZ in the Tenderloin neighborhood of San Francisco, California, and purchased suspected fentanyl. During that meeting, VELASQUEZ provided the UC with VELASQUEZ's phone number, ending in 6252 in order to broker future drug deals, which were conducted over the following months in Oakland. This investigation is supported by physical/electronic surveillance and controlled purchases of narcotics.

A. **August 17, 2023: the UC meets with VELASQUEZ and purchased suspected fentanyl**

14. On or about August 17, 2023, at approximately 6:00 p.m., an undercover officer ("UC") with the Alameda County Narcotics Task Force met with VELASQUEZ near the 600 block of Eddy Street in the Tenderloin neighborhood in San Francisco, California. The UC and VELASQUEZ engaged in a Spanish conversation. VELASQUEZ agreed to sell the UC one ounce of fentanyl. VELASQUEZ gave his phone number to the UC.

15. Shortly after, the UC observed VELASQUEZ retrieve one clear plastic bag containing suspected fentanyl from VELASQUEZ's backpack and give the bag to the UC. The UC then gave VELASQUEZ $200 as payment for the suspected one ounce of fentanyl.[1] Based on my knowledge, training, experience, consultation with other experienced officers, and knowledge of this investigation, I know the 600 block of Eddy Street in San Francisco is a location where drugs are sold, purchased, and used throughout the day and night.

---

[1] The DEA Western Laboratory later tested and identified this substance to be fentanyl.

**B.  August 28, 2023 and September 4, 2023: The UC and VELASQUEZ discuss a future fentanyl transaction**

16. On August 28, 2023, at approximately 12:54 p.m., the UC engaged in a text message conversation with VELASQUEZ. The Spanish conversation was captured, recorded, and maintained on ACNTF's recording system. The following is a Spanish to English preliminary transcript of an excerpt of the conversation between the UC and VELASQUEZ:

VELASQUEZ: What's going on?

UC: I'll call you next week to buy two or three ounces.

VELASQUEZ: That's fine, call me then.

17. Based on my knowledge, training, experience, consultation with other experienced law enforcement officers, and knowledge of the investigation, I believe the UC advised VELASQUEZ the UC would contact VELASQUEZ at a later day in order to purchase approximately two or three ounces of fentanyl from VELASQUEZ and VELASQUEZ told the UC to call him [VELASQUEZ].

18. On September 4, 2023, at approximately 6:20 p.m., the UC and VELASQUEZ, who was using a phone number ending in 6252, engaged in a text message conversation. The Spanish conversation was captured, recorded, and maintained on ACNTF's recording system. The following is a Spanish to English preliminary transcript of an excerpt of the conversation between the UC and VELASQUEZ:

VELASQUEZ: How much do you need?

UC: I am going to need three ounces.

VELASQUEZ: Yes.

19. Based on my knowledge, training, experience, consultation with other experienced law enforcement officers, and knowledge of the investigation, I believe VELASQUEZ again confirmed VELASQUEZ would sell the UC three ounces of fentanyl.

C. **September 6, 2023: The UC meets with VELASQUEZ and purchased suspected fentanyl**

20. On September 6, 2023, at approximately 4:16 p.m., the UC placed an outgoing phone call to VELASQUEZ.. The Spanish conversation was captured, recorded, and maintained on ACNTF's recording system. The following is a Spanish to English preliminary transcript of an excerpt of the conversation between the UC and VELASQUEZ:

UC: Hey what's up, I'm going to need three ounces regular.  How much will it be?

VELASQUEZ: It's going to be $1200.

UC: Why so much?

VELASQUEZ: It's clean, its good.

UC: Ok let me get $600 worth.

VELASQUEZ: Ok.

21. Based on my knowledge, training, experience, consultation with other experienced officers, and knowledge of this investigation, I believe the UC attempted to negotiate a fentanyl deal of three ounces, but due to the prices, the UC agreed to purchase $600 worth of fentanyl. I know drug traffickers, such as VELASQUEZ, often use the term "clean" to refer to a purer quality of fentanyl.

22. VELASQUEZ agreed to sell the UC $600 worth of fentanyl.

23. At approximately 5:08 p.m. that same day, the UC met VELASQUEZ in Oakland, California. The UC then observed VELASQUEZ retrieve approximately two ounces of suspected

7

white colored fentanyl from VELASQUEZ's hoodie pocket and put it on the middle console of the UC's vehicle. The UC then gave VELASQUEZ $600 for the suspected two ounces of fentanyl.[2] The following is a Spanish to English preliminary transcript of an excerpt of the conversation between the UC and VELASQUEZ:

> UC: Could you get me coke?
>
> VELASQUEZ: How much would you need?
>
> UC: I usually get ounces at a time.
>
> VELASQUEZ: I can get it for you, just let me see how much it is first.
>
> UC: What else can I get; I try to have a little bit of everything at a time.
>
> VELASQUEZ: Text me everything you need and I will get it for you, just give me one or two hour notice prior to you needing it.

24.     Based on my knowledge, training, experience, consultation with other experienced officers, and knowledge of this investigation, I know drug traffickers, such as VELASQUEZ, often use the term "coke" to refer to cocaine.

25.     I believe VELASQUEZ told the UC that VELASQUEZ had access to various drugs to include cocaine and fentanyl and all the UC would have to do is let VELASQUEZ know ahead of time ("….just give me one or two hour notice prior to you needing it.") and VELASQUEZ could supply the UC with the various drugs requested.

---

[2] The DEA Western Laboratory later tested and identified this substance to be fentanyl.

**D.     October 18, 2023: The UC meets with VELASQUEZ and purchased suspected fentanyl**

26.     On or about October 18, 2023, at approximately 12:29 pm, the UC placed an outgoing phone call to VELASQUEZ. The following is a Spanish to English preliminary transcript of an excerpt of the conversation between the UC and VELASQUEZ:

UC: I'm on my way, I need an ounce of clean.  Can I see you closer to 98th Avenue and International Boulevard.

VELASQUEZ: Yes.

UC: I will call you when I am ten minutes away from the area.

VELASQUEZ: Ok

27.     Based on my knowledge, training, experience, consultation with other experienced officers, and previous conversations between VELASQUEZ and the UC, I know drug traffickers, such as VELASQUEZ, often use the term "clean" to refer to a purer quality of fentanyl.

28.     At approximately 2:20 p.m. that same day, the UC met with VELASQUEZ in Oakland, CA. The UC had previously brokered a fentanyl drug deal with VELASQUEZ in order to purchase approximately three ounces of fentanyl from VELASQUEZ. During the meeting, VELASQUEZ initially sold the UC approximately one ounce of suspected fentanyl in exchange for $100.[3]

29.     After the initial fentanyl sale, the UC and VELASQUEZ discussed a discrepancy with the UC's drug order. The UC previously requested to purchase three ounces of "cut" fentanyl (fentanyl that has been altered and mixed with various cutting agents) and VELASQUEZ only

---

[3] The DEA Western Laboratory later tested and identified this substance to be fentanyl.

brought one ounce of "clean" fentanyl (fentanyl that is of purer quality). The UC conveyed to VELASQUEZ that the UC still wanted an additional ounce of fentanyl and wanted the additional ounce to be "cut" fentanyl.

30. VELASQUEZ then told the UC that VELASQUEZ needed to contact VELASQUEZ's fentanyl supplier. Based on toll records, the conversation between the UC and VELASQUEZ, and agents subsequent surveillance observations, I believe VELASQUEZ contacted his drug supplier. VELASQUEZ later obtained an additional ounce of fentanyl and sold the ounce of fentanyl to the UC.

**E.     November and December 2023: VELASQUEZ frequently travels to the Tenderloin Neighborhood in San Francisco**

31. On or about November 7, 2023, the honorable Alameda County Superior Court Judge Andrew Steckler granted order WAR844545 and on or about December 4, 2023, the honorable Alameda County Superior Court Judge Thomas Stevens granted order WAR849091, which both authorized the disclosure of physical location data for VELASQUEZ's suspected telephone, ending in 6252.

32. From about November 9, 2023, to January 2, 2024, agents obtained GPS cell phone ping location data pertaining to VELASQUEZ's telephone. Between November 2023 and December 2023, agents observed cell phone location data which put VELASQUEZ's telephone in the Tenderloin Neighborhood of San Francisco on multiple occasions.

33. Based on my knowledge, training, experience, consultation with other experienced law enforcement officers, knowledge of the investigation, and knowledge of similar investigations, I know the Tenderloin District is a common location for drug traffickers to meet and supply dealers and customers with drugs. This is likely due to the convenience of this location to conduct

meetings, the readily available transportation provided by BART, and other public transit, and the volume and frequency of drug transactions that already occur at this location. I know drug traffickers frequently travel to the Tenderloin neighborhood during the day and night hours to appease their customers. I believe VELASQUEZ frequently traveled to the Tenderloin Neighborhood in San Francisco to further VELASQUEZ's drug trafficking activities.

F.  **December 12, 2023: VELASQUEZ sells the UC approximately eight ounces of fentanyl**

34. On December 12, 2023, at approximately 9:22 a.m., the UC and VELASQUEZ engaged in a text message conversation for the purposes of purchasing suspected fentanyl. The Spanish conversation was captured, recorded, and maintained on ACNTF's recording system. The following is a Spanish to English preliminary transcript of an excerpt of the conversation between the UC and VELASQUEZ:

UC: Can we do half a pound.

VELASQUEZ: When can you pay for this half pound.

UC: when we meet.

UC: You need the money first?

VELASQUEZ: The truth is, I need the money first because I don't have money.

UC: That's fine, I'll see you there at 2:00 pm. I'll give you the money there.

VELASQUEZ: Ok, I am going to leave work and see what's up after you give me the money. I'm going to see if I can get you something possibly faster, I am going to talk to the guy to see how much it is.

UC: That's fine.

VELASQUEZ: You want regular right.

UC: Yes.

35. Based on my knowledge, training, experience, consultation with other experienced officers, and knowledge of this investigation, I believe the UC requested to purchase approximately a half-pound of fentanyl from VEALSQUEZ and VELASQUEZ wanted the UC to provide payment the fentanyl prior to VELASQUEZ obtaining the fentanyl.

36. At approximately 3:40 p.m. that same day, the UC met with VELASQUEZ at the pre-determined buy location in Oakland, CA. VELASQUEZ got into the driver seat of the UC's vehicle. VELASQUEZ asked for the money to pick up the suspected fentanyl. VELASQUEZ told UC that he would need $1,500 to pick up the suspected fentanyl. The UC and VELASQUEZ discussed how the transaction would take place due to the UC not allowing VELASQUEZ to take the money and come back at a later time.

37. At approximately 4:20 p.m., the UC observed VELASQUEZ make a phone call to who I believe based on my knowledge, training, experience, and consultation with other experienced officers, was VELASQUEZ's drug source. The UC overheard the conversation and believed VELASQUEZ relayed over the phone that VELASQUEZ was going to send someone to pick up the requested fentanyl.

38. Shortly after, VELASQUEZ exited the UC's vehicle and walked away from the UC's vehicle. The UC observed VELASQUEZ continue to speak on the phone. Agents maintained surveillance on VELASQUEZ. Agents observed VELASQUEZ enter and exit 909 39th Avenue Oakland, CA, and then meet with an unknown male (UM-1) who was in the driver seat of a 2005 Infiniti G35 parked near 39th Avenue and Wattling Street. VELASQUEZ and UM-1 traveled to the intersection of 42nd Avenue and International Boulevard and parked near 4108 International Boulevard.

39. At approximately 5:07 p.m., agents observed another unknown male (UM-2) enter the rear passenger seat of the Infiniti G35. At approximately 5:11 p.m., agents observed UM-2 exit the Infiniti G35 and travel back to the UC.

40. At approximately 5:20 p.m., VELASQUEZ entered the UC's vehicle. VELASQUEZ told the UC the new cost for the half-pound of fentanyl was $1,600. VELASQUEZ then sold the UC approximately a half-pound of suspected fentanyl in exchange for $1,600.

**G.  January 30, 2024: The UC purchases approximately six ounces of fentanyl from VELASQUEZ.**

41. On January 23, 2024, at approximately 9:22 a.m., the UC and VELASQUEZ, who was now using a phone number ending in 3969, engaged in a text message conversation for the purposes of purchasing suspected fentanyl. The Spanish conversation was captured, recorded, and maintained on ACNTF's recording system. The following is a Spanish to English preliminary transcript of an excerpt of the conversation between the UC and VELASQUEZ:

UC: How much for half a pound.

VELASQUEZ: It's the same.

UC: $1,600?

VELASQUEZ: Yes, that's what it is.

UC: what happened with the guy you were going introduce me to, so I could buy from him directly.

VELASQUEZ: No, I'm going to continue selling to you. I lost my job.

VELASQUEZ: When are you going to need the half pound?

UC: I will let you know

42. Based on my knowledge, training, experience, consultation with other experienced officers, previous conversations and drug deals between the UC and VELASQUEZ, and knowledge of the investigation, I believe the UC requested to purchase approximately a half-pound of fentanyl from VELASQUEZ and VELASQUEZ advised the price would be the same as what the UC previously paid. The UC stated, "$1,600" in which VELASQUEZ confirmed $1,600 was the price for a half-pound of fentanyl.

43. On or about January 30, 2024, at approximately 10:47 a.m., the UC and VELASQUEZ, who was the phone number ending in 3969, engaged in a text message conversation for the purposes of purchasing suspected fentanyl. The Spanish conversation was captured, recorded, and maintained on ACNTF's recording system. The following is a Spanish to English preliminary transcript of an excerpt of the conversation between the UC and VELASQUEZ:

UC: hey I need three ounces

VELASQUEZ: yea for what time

UC: 2 p.m.

VELASQUEZ: that's fine

UC: three regular

VELASQUEZ: yea let me see how much they are right now

UC: Ok i will see you at 2

VELASQUEZ: ok call me

44. Based on my knowledge, training, experience, consultation with other experienced officers, previous conversations and drug deals between the UC and VELASQUEZ, and knowledge of the investigation, I believe the UC requested to purchase approximately three ounces

14

of fentanyl from VELASQUEZ and VELASQUEZ confirmed VELASQUEZ would sell the UC approximately three ounces by stating, "yea for what time."

45. At approximately 2:45 p.m. that same day, the UC met with VELASQUEZ at a pre-determined location in Oakland, CA. VELASQUEZ entered the UC's vehicle. VELASQUEZ then sold the UC approximately three ounces of suspected fentanyl in exchange for $900. The UC then requested three more ounces of fentanyl from VELASQUEZ and VELASQUEZ told the UC VELASQUEZ would go get three more ounces of fentanyl for the UC. VELASQUEZ told the UC that VELASQUEZ had someone waiting for VELASQUEZ in a vehicle and VELASQUEZ was going to get a ride and be back within ten minutes. VELASQUEZ exited the UC's vehicle and walked away.

46. At approximately 3:12 p.m., VELASQUEZ returned to the UC's vehicle and sold the UC three additional ounces of suspected fentanyl in exchange for $900.

## CONCLUSION

47. Based on my training and experience, my participation in this investigation and the facts and circumstances set forth above, I believe there is probable cause to support the following Count:

**Count One**: On or about December 12, 2023, Denilson VELASQUEZ-Sevilla a/k/a GUILLE a/k/a YEYE, distributed and possessed with intent to distribute a mixture and substance containing fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

/s/ Hakeem Oduniyi
_____
HAKEEM ODUNIYI
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 11th day of ~~February~~ March 2024.  This application and warrant are to be filed under seal.

_____
HONORABLE DONNA M. RYU
United States Magistrate Judge