JODI LINKER
Federal Public Defender
Northern District of California
JOYCE LEAVITT
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:    (510) 637-3507
Email:         Joyce_Leavitt@fd.org

Counsel for Defendant VELASQUEZ-SEVILLA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DENILSON VELASQUEZ-SEVILLA,<br><br>Defendant. | **Case No.:** CR 24–221 JST<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:**         Courtroom 6, 2nd floor<br>**Hearing Date:**  September 20, 2024<br>**Time:**          9:30 a.m. |

# INTRODUCTION

Denilson Velasquez-Sevilla, who has no prior convictions and had never spent more than a few days in jail before this case, will be sentenced by this Court for selling fentanyl to an undercover officer in an attempt to earn money to send to his family in Honduras who were seriously struggling after the death of his father in August, 2023. As the oldest boy in his family, Mr. Velasquez-Sevilla came to the United States with the dream of escaping the extreme poverty which his family suffered in Honduras, but had trouble finding stable employment, was homeless and living in his car for an extended period of time, and ultimately became involved in the instant offense. He accepts responsibility and understands that he must now face the consequences of his actions.

The probation officer who prepared a Presentence Investigation Report calculates the advisory guideline range to be 57-71 months custody, but recommends that the Court vary downward and impose a sentence of 36 months custody, based upon Mr. Velasquez-Sevilla's youth, difficult childhood in Honduras, and substance abuse issues. *See* Presentence Investigation Report disclosed September 6, 2024 (PSR), Sentencing Recommendation at p. 2. Mr. Velasquez-Sevilla agrees that a downward variance is appropriate based not only upon the factors identified by the probation officer, but also based upon the additional custodial time Mr. Velasquez-Sevilla will spend following his criminal case as he awaits deportation to Honduras, and in order to prevent unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. For all of these reasons, Mr. Velasquez respectfully requests that the Court vary downward and impose a sentence of "time served." Such a sentence is appropriate based upon the factors delineated in 18 U.S.C. § 3553(a).

# ARGUMENT

### A. A sentence of "time served" is sufficient but not greater than necessary to meet the goals of sentencing

The Court is familiar with the directives of *United States v. Booker*, 543 U.S. 220 (2005), and 18 U.S.C. § 3553(a). The United States Sentencing Guidelines range is not mandatory, and the Court has a duty to exercise judgment and discretion in arriving at an appropriate sentence. Importantly, the Court may not presume the Guidelines range is reasonable, but instead must also consider the nature

and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants, among other factors. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6).

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The Sentencing Guidelines is one factor and may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Based on these factors, a variance and imposition of "time served" is warranted.

### 1. The Nature and Circumstances of the Offense

In determining an appropriate sentence in any given case, the Court must consider the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). In this case, Mr. Velasquez-Sevilla sold fentanyl to an undercover officer whom he believed to be a drug purchaser. PSR at ¶¶ 6-21. The undercover officer solicited drugs from him on five occasions between August 2023, and January 2024, culminating in Mr. Velasquez-Sevilla's arrest on March 13, 2024. PSR at ¶¶ 6-21. Notably, the first sale on August 17, 2023, in which Mr. Velasquez-Sevilla sold 27.9 grams of fentanyl for $200 to the undercover officer took place in the Tenderloin district of San Francisco, which is the central location where many Honduran street dealers are arrested for selling fentanyl, charged with federal cases and sentenced to "time served" sentences, before being deported.[1]

In Mr. Velasquez-Sevilla's case, however, the undercover officer did *not* signal for Mr. Velasquez-Sevilla to be arrested immediately following the August 17, 2023 drug sale in the Tenderloin district, but instead asked for Mr. Velasquez-Sevilla's cell phone number in order to continue soliciting larger quantities of fentanyl to purchase, thereby increasing his criminal exposure

---

[1] https://www.sfchronicle.com/crime/article/sf-drug-market-crackdown-tenderloin-feds-18460329.php

DEFENDANT'S SENTENCING MEMORANDUM
*VELASQUEZ-SEVILLA*, CR 24–221 JST

2

exponentially.[2] *Id*. at ¶¶ 6-21. As a result, Mr. Velasquez-Sevilla will now be sentenced based upon a total of 668 grams of fentanyl which he possessed or sold to the undercover officer over the course of seven months, rather than 27.9 grams of fentanyl which he initially sold to the undercover officer in the Tenderloin on August 17, 2023, during the first completed sale. *Id*.

Mr. Velasquez-Sevilla accepts full responsibility for his actions. As a result of his criminal conduct, Mr. Velasquez-Sevilla is currently serving time in jail and will be deported to Honduras once his sentence is completed. Mr. Velasquez-Sevilla understands that participating in the distribution of any illicit drug perpetuates the circulation of dangerous substances and harms the community. He was raised to be hardworking and law-abiding and is truly sorry for his conduct and the harm it has caused.

In mitigation, Mr. Velasquez-Sevilla's relative culpability should be viewed in the context of the broader fentanyl and opioid epidemic. Mr. Velasquez-Sevilla was a low-level dealer who sold drugs on the street. He did not choose the type of drugs being distributed in his community, nor was he primarily responsible for the widespread infusion of fentanyl which has crippled communities throughout the country. He pled guilty quickly and understands the consequences of his actions. He is deeply remorseful and also willing to stipulate to deportation. In considering the nature and circumstances of the offense, the probation officer correctly concluded that a substantial downward variance is warranted. Mr. Velasquez-Sevilla is requesting a further variance, however, and imposition of a "time served" sentence.

### 2. Mr. Velasquez-Sevilla's History and Characteristics

Under 18 U.S.C. § 3553(a), Mr. Velasquez-Sevilla's history and characteristics must also be considered. "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J.,

---

[2] On August 17, 2023, the undercover requested 27.9 grams of fentanyl, PSR at ¶ 9, and subsequently contacted Mr. Velasquez-Sevilla to purchase 56.7 grams of fentanyl on September 6, 2023, 225.7 grams of fentanyl (quadruple the amount previously requested) on December 12, 2023, 170 grams of fentanyl on January 30, 2024, and 129 grams of fentanyl which he possessed on March 13, 2024.

concurring). Here, Mr. Velasquez-Sevilla's personal history, including his impoverished upbringing in Honduras, responsibility to his family as the oldest boy, lack of education, and struggle with addiction all are reasons to vary downward, and impose a sentence of "time served." Mr. Velasquez-Sevilla was born in Tegucigalpa, Honduras, on March 15, 1999, into extreme poverty, and daily life was difficult. *Id*. at ¶¶ 49, 50. Mr. Velasquez-Sevilla's family was very poor and the family had to work hard just to afford basic necessities. *Id*. at ¶ 50. As the oldest male child, Mr. Vasquez-Sevilla was imbued with the responsibility of ensuring that his family's needs would always be met. Consistent with this responsibility, Mr. Vasquez-Sevilla took on additional tasks even as a young boy, such as helping his parents around the home, doing errands, getting firewood, and bringing his father food at his job. *Id*. at ¶ 50. He stopped attending school in sixth grade because the family could not afford the mandatory tuition or other school fees.[3] *Id*. at ¶ 63. By the age of 15, Mr. Velasquez-Sevilla was working in Honduras, primarily in seasonal jobs, such as making concrete blocks, welding, and also working in a tire shop. *Id*. at ¶ 64. As a young child, Mr. Velasquez-Sevilla had physical health issues, including suffering from asthma before he was five years old, *id*. at ¶¶ 51, 57, culminating in episodes in the middle of the night since he was five years old, in which he wakes up dizzy and vomiting every few months. *Id*. This pattern has gone on for more than 20 years but has never been diagnosed.[4] *Id*. at ¶57.

  Mr. Velasquez-Sevilla felt compelled to come to the United States to help support his family in part, because the poor wages and poor medical care in Honduras contributed to the family's financial struggles there. *Id*. at ¶ 52. For example, the poor medical care directly affected both Mr. Velasquez-Sevilla's sister, Dayra, who was diagnosed with epilepsy and requires ongoing medication and medical appointments, as well as his mother, who suffers from bone-related illnesses and arthritis. *Id*. at ¶ 54. During Mr. Velasquez-Sevilla's various trips to the United States, he suffered extreme trauma from events during his travel which included being kidnapped by the Mexican mafia and forced to

---

[3] According to Mr. Velasquez-Sevilla, there is no cost to attend school up until the 6th grade after which tuition and other school fees are imposed. In addition, Mr. Velasquez-Sevilla struggled in school and had to repeat third grade because his grades were not sufficient. PSR at ¶ 63.
[4] Mr. Velasquez-Sevilla's sister who has epilepsy suffers the same symptoms but he has neither been tested for, nor diagnosed with, epilepsy.

DEFENDANT'S SENTENCING MEMORANDUM
*VELASQUEZ-SEVILLA*, CR 24–221 JST

4

work for them until he could secure his release after approximately one month during one trip, and being chased by a group of six men with machetes and other weapons during a separate trip, during which he was forced to flee for his safety, walk more than 20 days in extreme weather, and ultimately find his way back to the train which had taken him part of the way until he was forced to flee from the armed men. *Id*. at ¶ 52. Despite the dangers, Mr. Velasquez-Sevilla had hope that he would be able to support his family.

But after he arrived in the United States, Mr. Velaquez-Sevilla struggled to find full-time permanent employment, had no stable housing, and lived out of his car for some time, unable to ever fully secure financial stability. *Id*. at ¶¶ 53, 54. When his father became sick from COVID-19 and died of a heart attack in August 2023, Mr. Vasquez-Sevilla felt even more pressure to do whatever was necessary to assist his family back home. *Id*. at ¶ 54. He described the circumstances back home in Honduras as "out of control," as the family struggled with unpaid bills and ongoing expenses for medical, school, food, and electricity with his father gone. *Id*.

Against this backdrop, it is not a coincidence that the very month that Mr. Velasquez-Sevilla's father died in August, 2023, was the same month that an undercover officer first spotted Mr. Velasquez-Sevilla in the Tenderloin area of San Francisco selling drugs. *Id*. at ¶¶ 7, 8, 54. Although Mr. Velasquez-Sevilla continued to work lawfully part-time in construction whenever the work was available, he could not make enough money to assist his family and was desperate to help his Honduran family however he could financially, including talking to the undercover officer purporting to be a drug purchaser to whom he was selling drugs, to see if he could help Mr. Velasquez-Sevilla obtain lawful employment.[5] PSR at ¶ 54.

Finally, Mr. Velasquez-Sevilla's mental health and addiction to drugs and alcohol also contributed to his becoming involved in the offense conduct. In the past, Mr. Velasquez-Sevilla

---

[5] Even as Mr. Velasquez-Sevilla was selling drugs to the undercover officer, he repeatedly spoke with the undercover officer about his family circumstances. *See* Discovery provided by the government at bates 64 at 12:44 ("sister in the hospital"), 15:10 ("This isn't really what I do"), 16:00 ("rather work straight but . . . really need the money"), 19:50 ("I was working in a legal job"); and bates 65 at 1:10 ("I don't want to do this kind of thing") after which the undercover agent continues to press Mr. Velasquez-Sevilla to sell him more fentanyl that afternoon, telling him he has a son and needs to take care of his family.

DEFENDANT'S SENTENCING MEMORANDUM
*VELASQUEZ-SEVILLA*, CR 24–221 JST

suffered from depression and grappled with suicidal thoughts after he arrived in the United States at age 22, after he was unable to find work, feeling unworthy and lacking purpose. *Id*. at ¶ 59. At the same time, Mr. Velasquez-Sevilla was struggling to remain sober and becoming more dependent upon alcohol and cocaine to help him cope. *Id*. at ¶ 61. He recognizes that his dependency on alcohol and drugs clouded his judgment and contributed to his involvement in the offense conduct. *Id*. at ¶ 28. When asked what influenced him to commit the offense, Mr. Velasquez referenced both the family's financial constraints and his dependence on drugs:

> My oldest siblings in my dad's house wanted to kick out my mom . . . and my dad died . . . we were trying to make plans for mom so she wouldn't be homeless. I wasn't earning enough working from 8:00 a.m. to nighttime doing construction earning $150 day and we were worried about our mom. Additionally, using drugs clouded my judgment and I was not thinking clearly . . . because of that I made a lot of bad decisions.

PSR at ¶ 28.

Mr. Velaquez-Sevilla's reduced mental capacity is a mitigating factor which contributed to the commission of the offense, and his voluntary drug use does not negate the applicability of this factor. *See, e.g United States v. Cantu*, 12 F.3d 1506, 1512, 1516 (9th Cir. 1993) (The goal . . . is lenity towards defendants whose ability to make reasoned decisions is impaired); *United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993) (even though drug use and even though mental disease not severe, drug use was both a "product and factor of his impaired condition"). Mr. Velasquez-Sevilla had never sought drug treatment prior to his incarceration but has participated in one-hour classes twice a week, since being transferred to Marin County Jail. PSR at ¶ 62. Mr. Velasquez-Sevilla's history and characteristics warrant a downward variance and imposition of a "time served" sentence.

        **3.**      **Mr. Velasquez-Sevilla's age at the time of the offense is mitigating**

Mr. Velasquez-Sevilla was 24 years old at the time he committed the offenses in 2023. PSR at page 3, ¶¶ 7-13.] Although people are deemed adults when they turn 18 years old, the U.S. Sentencing Commission ("U.S.S.C.") has recognized neurological research that shows brain development is not fully realized in most people until they turn 25 years old.  More specifically, researchers have found that the prefrontal cortex of the brain which "is utilized in impulse control, emotional reactions, executive function and decision making" is the last part of the brain to develop. It "is not complete by the age of 18 . . . development continues into the 20s" and "most researchers

reference 25 as the average age at which full development has taken place."[6]

The Supreme Court has repeatedly recognized that "because juveniles have lessened culpability they are less deserving of the most severe punishments." *Graham v. Florida*, 560 U.S. 48, 68 (2010). It has abolished the death penalty and life without parole sentences for all juveniles. *See Roper v. Simmons*, 543 U.S. 551 (2005); *Miller v. Alabama*, 567 U.S. 460 (2012). The Supreme Court reasoned that because "juveniles have a 'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" *Graham*, 560 U.S. at 68 (quoting *Roper*, 543 U.S. at 569-70). While a "juvenile is not absolved of responsibility for his actions … his transgression 'is not as morally reprehensible as that of an adult.'" *Graham*, 560 U.S. at 68 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988)). As a result, "it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects . . . transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id*.

Mr. Velasquez-Sevilla's youth is a mitigating factor. His conduct occurred when he was 24 years old and in the absence of prior criminal convictions, and it is more reflective of "transient immaturity" than "irreparable corruption." His history of hard-work started when he was a young boy and teenager in Honduras, and he continued to work and try to support his family lawfully until the death of his father. The pressure which Mr. Velasquez-Sevilla felt to support his family after his father died, combined with his depression and clouded judgment stemming from his drug and alcohol use, led him to commit the offenses for which he will now be sentenced. However, his background and lack of criminal history demonstrates that the offense conduct is out of character for Mr. Velasquez-Sevilla and more representative of "transient immaturity" than of "irreparable corruption." *Id*. at ¶ 64; *Graham*, 560 U.S. at 68. This is a mitigating factor which warrants imposition of a "time served" sentence.

---

[6] *See* United States Sentencing Commission, "Youthful Offenders in the Federal System," p. 6, 7 available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf.

DEFENDANT'S SENTENCING MEMORANDUM
*VELASQUEZ-SEVILLA*, CR 24–221 JST

### 4. Immigration consequences including continued detention

Despite Mr. Velasquez-Sevilla's minimal arrest and conviction history, the instant conviction is serious and will undoubtedly subject him to draconian immigration consequences. It is almost certain that Mr. Velasquez-Sevilla will be deported following completion of his sentence. Furthermore, because of the nature of the charges, the conviction will also trigger severe immigration penalties beyond deportation, foreclosing almost every avenue of relief that Mr. Velasquez-Sevilla would otherwise have been able to pursue as a potential defense in immigration proceedings. Instead, Mr. Velasquez-Sevilla likely will be rendered permanently inadmissible to the United States and barred from re-entry for the rest of his life. Furthermore, before he is deported, Mr. Velasquez-Sevilla will spend an uncertain period of time in immigration detention – a time period that could easily stretch to months – which will be an additional custodial consequence of his conduct. This is an additional reason to impose a lesser sentence in this case than otherwise recommended by the probation officer and prosecutor, in order to account for time spent in immigration custody.

### 5. The Need to Avoid Unwanted Sentencing Disparities

Section 3553(a)(6) requires a court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See Gall,* 552 U.S. at 56. Here, Mr. Velasquez-Sevilla is a Honduran national who pled guilty to possession with intent to distribute fentanyl, after he sold fentanyl to an undercover officer, first in the San Francisco Tenderloin area and later in Oakland. PSR at ¶¶ 6-21. Although many Honduran nationals arrested for selling similar quantities and types of drugs as that sold by Mr. Velasquez-Sevilla, are offered "fast track" dispositions and "time served" sentences, Mr. Velasquez-Sevilla was not given a "fast track" offer. Nonetheless, this Court should still compare Honduran drug sales cases which are similar to that of Mr. Velasquez-Sevilla with this case in order to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

For example, while Mr. Velasquez-Sevilla's offense conduct involves multiple sales to an undercover officer, other Honduran defendants who sold on multiple occasions to an undercover officer, some sales of which also occurred outside San Francisco, have received sentences which are substantially less than what is recommended by either the prosecutor or probation officer in this case.

*See, e.g. United States v. Turcios-Cortez*, 23-278 CRB (Honduran defendant arrested for multiple sales of fentanyl & methamphetamine on five occasions with guideline range of 57-71 months sentenced to "time served" after one month in custody); *United States v. Melendez-Soto*, 23-0322 EMC (24 year old Honduran defendant sold to undercover officer in Marin County, and while on pre-trial release sold drugs in the Tenderloin. Arrest in Marin county involved sale of two ounces of fentanyl for $480 to undercover officer, with hidden compartment in car containing 539.7 grams of fentanyl, 115.3 grams of methamphetamine, 2.64 grams of cocaine base and guidelines of 87-108 months and defendant sentenced to "time served" plus one day.); *United States v. Erias-Gamez*, 23-394 EMC (28 year old Honduran with prior drug trafficking arrests in San Francisco from July 2020, September 2020, May 2022, Sept 2022, Feb 2023, and prior drug trafficking arrests from San Rafael and Oakland in April 2021 and Nov 2022, with active stay away order, arrested with 94 grams of fentanyl, charged federally, and sentenced to "time served."); *United States v. Grandez Meraz,* 23-488 EMC (19 year old Honduran from same town at Mr. Velasquez-Sevilla arrested previously in Tenderloin, granted state pre-trial release with "stay away" order, arrested in the same neighborhood with 44 grams fentanyl, sentenced to "time served."); *United States v Irias Perez*, 23-319 CRB (29 year old Honduran with 399.8 grams of gross fentanyl, as well as methamphetamine, heroin, cocaine base, and guidelines of 57-71 months custody (same guideline range as Mr. Velasquez-Sevilla) sentenced to "time served.")

  The Court should also consider fast track cases involving Honduran defendants and fentanyl distribution in which there may not be multiple sales, but the quantities are greater or equal to what was found in this case, and yet the sentence imposed is lower than that recommended by probation in Mr. Velasquez-Sevilla's case for individuals with similar records and similar conduct. *See, e.g. United States v. IE*, 23-CR-166 VC (imposing "time served plus 1 day" after 4 months in custody for defendant who possessed 254.6 grams of fentanyl and 260.3 grams of methamphetamine with guidelines of 70-87 months); *United States v. M.A.*, 23-CR-344 SI (imposing "time served" after 17 days in custody for defendant who possessed 1,018 grams fentanyl (white colored) and 334.3 grams fentanyl (multi-colored) with guidelines of 57-71 months.)

  While no case is identical, the cases cited above are all from this district, and involve similar

DEFENDANT'S SENTENCING MEMORANDUM
*VELASQUEZ-SEVILLA*, CR 24–221 JST

9

defendants, with similar (or worse) records, who have been found guilty of similar (or worse conduct) and yet are sentenced to substantially less time than that proposed in Mr. Velasquez-Sevilla's case. The Court should be concerned about avoiding unwarranted disparities for similar defendants with similar offenses and impose a "time served" sentence in this case.

### 6. The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law and to Provide Just Punishment and Deterrence

A sentence of "time served" adequately promotes respect for the law, just punishment and adequate deterrence for Mr. Velasquez-Sevilla. This is true because Mr. Velasquez-Sevilla, who has no prior convictions, has been in custody for more than 6 months which has punished him. Mr. Velasquez-Sevilla also has been deterred, as his goals moving forward include living a "calm, law-abiding life, free from drugs and alcohol." PSR at ¶ 54. Furthermore, Mr. Velasquez-Sevilla will be deported once his sentence is completed such that the community is not at risk. The proposed sentence of "time served" is sufficient but not greater than necessary.

### B. The JSIN data should be struck from the PSR and should not be considered as a factor in the Court's sentencing decision

Mr. Velasquez-Sevilla asks the Court to refrain from relying upon data from the Judiciary Sentencing Information (JSIN) which is included in the PSR on the grounds that it is not statistically reliable regarding "similarly situated defendants" and should be struck under Rule 32 and the Due Process Clause. The data presented are skewed upward and therefore misleading. The JSIN data is problematic and the Court should not consider it for the following reasons:

- The JSIN data includes only "length of imprisonment", rather than "sentence length". "When Commission publications refer to 'average sentence,' usually both alternative months of confinement as well as sentences of probation are included (i.e., [SENSPCAP or SENSPLT0] is used). However, when Commission documents refer to 'average length of imprisonment,' usually only prison sentences are included [SENTTCAP or SENTTOT]." Appendix B, USSC Codebook FY99-FY21. As a result, both probationary sentences and alternative confinements are excluded, skewing the results upward.
- The JSIN treats "time served" sentences differently than probationary sentences, treating the number of months served prior to sentencing as the sentence intended by the judge, even if the

intent of the judge was to impose a noncustodial sentence.

- Sentences with 5K1.1 departure are excluded. This skews the data away from 0, when underlying conduct is arguably similar.
- Career offenders and defendants facing mandatory minimums are automatically included.
- The data here includes only national results. Due to regional differences, for example in how state cases enhancing the federal guideline range are prosecuted, data from this district as well as from the Ninth Circuit should also be included if any statistics are to be considered.
- JSIN "averages" omits information on where sentences fall within the guideline range. There is nothing inherently wrong with an average as a standalone descriptive statistic. But statistics are not neutral. It is only natural to project onto a statistic certain assumptions about a group of say, similarly situated defendants.

In sum, JSIN provides aggregate statistics for all defendants that fall in a particular guidelines cell, but the offenders in this cell are not necessarily "similar" and there is no way to determine in which ways they are similar or dissimilar. This is especially true where many, many individuals who are similarly situated to Mr. Velasquez-Sevilla and were sentenced in this district received "time served" sentences, none of which are included in these statistics.

## CONCLUSION

For the reasons set forth above, Mr. Velasquez-Sevilla respectfully requests that the Court vary downward and impose a sentence of "time served." Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated:  September 13, 2024

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

　　　　　　　／S／
JOYCE LEAVITT
Assistant Federal Public Defender

DEFENDANT'S SENTENCING MEMORANDUM
*VELASQUEZ-SEVILLA*, CR 24–221 JST

11